## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| Victoria ZIMMERMAN and Jeff GREIVELDINGER, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 3:23-cv-405 |
| vs. | ) ) ) | |
| EPIC SYSTEMS CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Victoria Zimmerman and Jeff Greiveldinger, for their Complaint against Defendant Epic Systems Corporation, on behalf of themselves and all others similarly situated, state and allege as follows:

### NATURE OF THE CASE

1.      This case is the result of Defendant Epic Systems Corporation's ("Epic") unlawful bias and pattern and practice of religious discrimination against its employees, including Plaintiffs Victoria Zimmerman and Jeff Greiveldinger, who requested religious accommodations exempting them from Epic's COVID-19 vaccine mandate based on their sincere religious beliefs. These employees posed no increased risk to their coworkers or customers. And Epic knew (or should have known) that it could safely and reasonably accommodate these employees' beliefs. But Epic would not. It disfavored these employees' beliefs and disregarded their legal rights.

2.      Rather than provide accommodations, Epic implemented a policy and practices designed to uniformly refuse accommodations and to force employees to abandon or violate their religious beliefs. If employees would not, Epic purged them from the company.

1

3.      For employees like Mr. Greiveldinger, Epic summarily denied their requests for a religious accommodation exempting them from Epic's vaccine mandate without ever engaging in any interactive process or good-faith effort to determine if a reasonable accommodation was available.

4.      Others, including Ms. Zimmerman, were informed by Epic leaders that their request for accommodation was granted. But these employees quickly learned that Epic's purported accommodation was a sham and was never intended to be reasonable. Epic leaders imposed pretextual rules intended to humiliate, stigmatize, and coerce religious employees, rather accommodate their beliefs. Epic demoted these employees, altered their positions and job requirements, and took other adverse actions without any legitimate cause or basis.

5.      Employees who were supposedly granted accommodations were prohibited from sharing an elevator with coworkers, prohibited from entering Epic's dining facilities, and were limited to just two visits to Epic's breakroom per day, and then only no other employees were present (as if their third visit to an empty breakroom would somehow be a hazard to others). None of this was necessary. And, in the end, when religious employees did not relent and violate their beliefs, Epic revoked their accommodations and terminated their employment.

6.      Epic's discrimination and refusal to provide accommodations did not relate to any legitimate hardship or business concern. Available reasonable accommodations would have caused no hardship in the conduct of Epic's business, while firing religious employees, and being forced to recruit replacements created a real and substantial business hardship. But Epic was not concerned about facts or business. Its decisions were driven by unlawful and intentional bias.

7.    Epic adopted an intentional and unlawful policy and practice of refusing accommodations (and providing temporary sham, coercive, and unreasonable accommodations) was intended to purge the company of religious employees whose beliefs prevented vaccination.

8.    This lawsuit is the necessary consequence of Epic's unlawful decisions and actions that have caused substantial harm to Mr. Greiveldinger, Ms. Zimmerman, and to many others.

## JURISDICTION AND VENUE

9.    The Court has subject matter jurisdiction over this case under: (a) 28 U.S.C. § 1331, as this action arises under the laws of the United States; and (b) 28 U.S.C. § 1343(a)(4), as it seeks to recover damages, attorneys fees, and secure equitable relief under Acts of Congress, specifically Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C §§ 2000(e), et seq.

10.    Venue is proper in the United States District Court for the Western District of Wisconsin under 28 U.S.C. § 1391(b), as all or a substantial part of the events giving rise to the claims occurred within this District.

11.    This Court has personal jurisdiction over Epic as it is incorporated in, and has its principal place of business in, the state of Wisconsin.

## THE PARTIES

12.    Defendant Epic is a healthcare software developer incorporated and organized under the laws of Wisconsin, with its principal place of business at 1979 Milky Way, Verona, Wisconsin 53593.

13.    At all times relevant to the Complaint, Epic employed more than 10,000 employees.

14.    Plaintiff Jeff Greiveldinger is a former employee of Epic where he worked From March 2003 until September 2021 in Technical Services.

15.     At all relevant times, Mr. Greiveldinger was and is a resident of Dane County, Wisconsin.

16.     Plaintiff Victoria Zimmerman is a former employee of Epic where she worked from August 2012 until November 2021 in Quality Management.

17.     At all relevant times, Ms. Zimmerman was and is a resident of Green County, Wisconsin.

## EPIC MANDATES COVID VACCINES
## AND DISCRIMINATES AGAINST RELIGIOUS EMPLOYEES

18.     In July 2021, Epic announced that all of its U.S. employees would be required to be fully vaccinated against COVID-19 by October 1, 2021, as a condition of employment.

19.     Epic's email announcement did not mention whether employees with religious beliefs could request an accommodation exempting them from Epic's vaccine mandate.

20.     Prior to mandating vaccination, when COVID vaccines became widely available in the spring of 2021, Epic began a concerted effort to encourage vaccination amongst its employees by scheduling on-site vaccination clinics and sending frequent email messages extoling the benefits of COVID vaccination.

21.     Throughout this effort, Epic kept a record which employees were unvaccinated.

22.     In July 2021, when it announced its COVID vaccine mandate, Epic publicly stated that ninety-seven percent (97%) of its over-10,000 employees were already fully vaccinated with a COVID vaccine.

23.     At this time, Epic also knew that of the remaining 3% of its employees who were not vaccinated for COVID, many would request religious accommodations seeking exemption from its vaccine mandate. And Epic knew that these employees were entitled to make such requests

under Title VII and Epic knew or should have known it could grant such requests without any undue hardship.

24.     Despite this legal framework, Epic's public announcement regarding its COVID vaccine mandate made clear the company did not intend to provide religious accommodations. Epic issued a statement to the media that it ***"recognize[d] some employees may choose not to get vaccinated and hence will not be able to continue in their role."***

25.     When Epic announced its vaccine mandate to employees, Epic did not inform employees that they could request and potentially be granted religious accommodations exempting them from Epic's mandate.

26.     Shortly after it announced its mandate, Epic Human Resources personnel began a campaign of confronting unvaccinated employees over whether they intended to comply with its vaccine mandate.

27.     During this pressure campaign, some employees learned for the first time the details of Epic's exemption process and the possibility of requesting an accommodation from Epic's mandate. Unfortunately, Epic had designed a new exemption process intended to discourage and deny requests for religious accommodation related to its COVID vaccine mandate.

28.     Epic required employees seeking religious accommodations related to its COVID vaccine mandate to complete a "Religious Accommodation Request" form.

29.     Epic created and required this form only for accommodations related to COVID vaccination. Epic disfavored beliefs that prevented COVID vaccination and intended to make it more difficult for such employees to obtain religious accommodations.

30.     Epic's form required employees to describe their religious beliefs or practices that prevented them from receiving a COVID vaccine and warned them that Epic intended to challenge

their religious beliefs by requiring them to acknowledge that Epic could require "supporting documentation" to evaluate their "religious beliefs and practices," even if employees' sincere beliefs were clearly provided on the company's the form.

31.     After completing and returning their form requesting accommodation to Epic's Human Resources department, employees were not informed how their request would be reviewed or what criteria Epic would use to evaluate their requests.

32.     In the end, Epic denied all or almost all employees' requests for religious accommodation exempting them from COVID vaccination.

33.     Epic had no lawful justification for its denial and sought to hide its true reasons. It avoided written explanations and deliberately instructed its Human Resources employees to deliver bad news by phone.

## EPIC WAS AWARE THAT IT COULD PROVIDE ACCOMMODATIONS AND VACCINATION DID NOT PREVENT TRANSMISSION OF COVID

34.     By late summer and fall of 2021, Epic knew that the vaccine did not prevent the spread of COVID or, at a minimum, that any difference in the risk of transmission of COVID by vaccinated individuals compared to unvaccinated individuals was uncertain at best.

35.     Epic knew that both vaccinated and unvaccinated individuals could be infected with COVID and both had similar COVID viral loads, a key measure of potential transmissibility.

36.     The "secondary attack rate" of COVID is the rate of transmission of the virus between an infected individual and her or his contacts (such as coworkers). A study published in the *Lancet* and publicized by the U.S. Centers for Disease Control and Prevention ("CDC") in October 2021 demonstrated that the secondary attack rate for vaccinated individuals was similar as the rate for unvaccinated (25% vs 23%), but ***unvaccinated*** individuals were slightly ***less likely*** to spread COVID to close contacts than individuals who had been vaccinated.

6

37.     On February 4, 2020, "[t]he HHS Secretary declared that circumstances exist justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic, pursuant to section 564 of the FD&C Act, effective March 27, 2020." https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization#vaccines. Thereafter, beginning in December 2020, pursuant to this declaration, the FDA issued an emergency use authorization for several vaccines and boosters. The FDA later issued a non-emergency authorization of a vaccine for COVID-19.

38.     To date, no COVID-19 vaccine has been approved to prevent the transmission of COVID-19 from an infected individual to another individual. In fact, the CEO of Pfizer at the time Pfizer was authorized to sell its product for the above use, stated that it was "still unknown whether people who've been vaccinated could still be carriers of the virus, able to transmit it to others" and that he thought the ability of the vaccine to prevent transmission was "something that needs to be examined" and that he was "not certain about [whether the vaccine could prevent transmission] right now."

39.     All COVID-19 vaccine manufacturers have received multiple updates to their authorizations to use, primarily to expand the ages indicated as well as add the use as a booster. To date, none of these manufacturers have added an indication or use for a COVID vaccine related to stopping, slowing, or otherwise impacting the transmission of COVID-19 from an infected individual.

40.     Stated otherwise, no approved COVID-19 vaccine has, at any time, been approved for the purpose of affecting transmission of COVID-19. None of the vaccine manufacturers has ever made an official claim that their vaccines could affect the transmission of COVID-19 because

doing so would be unlawful. Thus, Epic was conditioning employment on an off label, unapproved use of a vaccine.

41. In addition, CDC and scientific journals have published data showing that any initial effectiveness of COVID vaccines wanes substantially over time. Data confirms that vaccines and boosters are not effective against successive COVID variants.

42. Regardless of the precise difference in potential transmission or risk of transmission between unvaccinated individuals and vaccinated individuals, Epic knew that unvaccinated individuals could perform regular self-testing at their own expense. And Epic briefly required some employees with approved accommodations to self-test three times per week. Both self-tests and laboratory testing have been available in Wisconsin and other states, free of charge, including in the fall of 2021.

43. If unvaccinated individuals engaged in regular testing, along with other common sense precautions, their likelihood of transmission would be lower than vaccinated individuals who Epic did not require to test.

44. In the fall of 2021, the CDC's website explained that self-testing can be used to detect COVID and prevent transmission "by anyone who is symptomatic regardless of their vaccination status" and that "Unvaccinated people without COVID-19 symptoms can also use self-tests, especially if they were potentially exposed to someone with COVID-19."

45. The CDC specifically endorsed "serial testing" as a means to prevent the spread of COVID. The CDC explained that:

> Serial testing is when a person tests themselves multiple times for COVID-19 on a routine basis, such as every few days. By testing more frequently, you might detect COVID-19 more quickly and could reduce the spread of infection. Some self-administered tests come with more than one test and instructions for performing serial testing.

46.     When Epic denied religious accommodations, it knew or should have known that the hardship to its business of having to recruit and replace discharged employees far outweighed any conceivable hardship from unvaccinated employees who were granted religious accommodations.

47.     Facts did not matter to Epic. The company did not care that self or laboratory tests were available free to unvaccinated employees who could—and did—engage in serial testing on a regular basis to ensure they did not potentially transmit COVID to others.

48.     And, for those vaccinated employees who Epic claimed could safely work in-person with others—but who had the same or similar COVID viral loads and secondary attack/transmission rates—Epic did not require testing or similar preventive measures that were readily available.

49.     Many reasonable options for accommodations existed that would have allowed unvaccinated employees to work at Epic facilities, visit customers, and safely continue performing their job duties without presenting any greater risk (and with available precautions, presenting less of a risk) of transmitting COVID to others than vaccinated individuals.

50.     Epic could have allowed unvaccinated employees to regularly present a negative COVID test on a weekly basis. Epic initially recognized that this measure was a reasonable and appropriate accommodation, before it inexplicably reversed course. If Epic had allowed unvaccinated employees to continue to work with weekly testing, these employees would have actually been significantly *less likely* to spread COVID than their vaccinated colleagues.

51.     Epic was not concerned with such facts, it hoped to eliminate employees whose beliefs prevented vaccination from its ranks.

## EPIC'S UNLAWFUL AND DISCRIMINATORY
## CONDUCT AGAINST NAMED PLAINTIFFS

52.     While Plaintiffs had different job duties, worked in different divisions, served different clients, and had different beliefs, Epic applied the same unlawful and discriminatory policy and practices to all employees seeking religious accommodation exempting them from Epic's COVID vaccine policy.

### Jeff Greiveldinger

53.     Mr. Greiveldinger was one of Epic's longest-tenured employees. Hired in 2003, he served for over 18 years performing software development and providing technical support, primarily in Epic's Technical Services division. For his accomplishments, Mr. Greiveldinger consistently received positive performance reviews and several awards for his contributions to important projects.

54.     Throughout his employment at Epic, he was expected to develop close relationships with his clients such that he would be viewed as a member of the client's team. Because of his dedication to this end, Mr. Greiveldinger had the unique distinction of maintaining his client relationship with the Children's Hospital of Philadelphia for the duration of his 18 year career at Epic.

55.     As a support specialist, Mr. Greiveldinger periodically traveled to provide on-site support to his clients. These trips were driven by client needs such as support for software upgrades, new application rollouts, special projects, and strategic planning.

56.     In the last 16 months of Mr. Greiveldinger' s employment at Epic before the vaccine mandate (March 2020 – July 2021), Mr. Greiveldinger traveled only three times to client sites.

57.     Mr. Greiveldinger is also a Christian. He believes in God Almighty and he accepts the Bible as the governing authority for all aspects of his life. As a result of this faith, Mr. Greiveldinger believes in the sanctity of human life from the moment of conception until natural death.

58.     When Epic first announced its vaccine mandate, Mr. Greiveldinger was away on vacation.

59.     When he returned to work on August 9, 2021, a representative from Epic's Human Resources department telephoned Mr. Greiveldinger to identify whether he intended to comply with Epic's vaccine mandate. During this phone call he learned that Epic had an accommodation process.

60.     On August 11, 2021, Mr. Greiveldinger completed Epic's "Religious Accommodation Request" form and submitted his request to Human Resources.

61.     In his request, Mr. Greiveldinger described his sincere Christian beliefs, and explained the conflict between these beliefs and Epic's vaccine mandate. His request made clear that because the available COVID vaccines were developed or tested using aborted fetal cells, and he is obligated by the Bible to "make prudential decisions" regarding his body. To receive a COVID vaccine would violate the requirements of his religious beliefs.

62.     On August 20, 2021, Epic telephoned Mr. Greiveldinger to inform him that his request for religious accommodation was being denied because Epic believed that its customers would prefer that Mr. Greiveldinger be vaccinated, and because his vaccination status might prevent him from traveling and working on-site.

63.    Mr. Greiveldinger informed Epic that his vaccination status would not prevent him from serving his clients because they were no longer requiring on-site support. And in fact, he had only been asked to travel a total of four times over the previous 16 months.

64.    Epic did not provide its alleged rationale for denying Mr. Greiveldinger's accommodation request in writing until Mr. Greiveldinger asked for a formal explanation.

65.    On September 7, 2021, Mr. Greiveldinger sent an email to Epic's Human Resources department outlining a path forward that would allow him to perform his core job duties, including some travel, without being vaccinated.

66.    Epic refused to engage in any good-faith interactive process. Instead, it terminated Mr. Greiveldinger's employment on September 30, 2021.

67.    Mr. Greiveldinger filed a timely charge of discrimination with the EEOC describing Epic's discrimination and failure to accommodate his religious beliefs.

68.    On March 20, 2023, the EEOC issued a Notice of Right-to-Sue, and Mr. Greiveldinger timely brings this action.

**Victoria Zimmerman**

69.    Ms. Zimmerman was hired by Epic on August 6, 2012, to work in quality assurance. In 2014, Epic promoted Ms. Zimmerman to the role of Quality Management Team Lead, where she initially supervised a team of three direct reports, and was promoted again to oversee a team of ten direct reports.

70.    In this role, Ms. Zimmerman was expected to, but not required to, travel twice per year to work on-site with clients.

71.     Ms. Zimmerman is also a Christian who believes in the sanctity of human life, that abortion is morally wrong, and that for her to support or benefit from abortion, in any way, would be a sin against God.

72.     Ms. Zimmerman also believes that accepting a COVID vaccine violates Scripture's teaching regarding her personal accountability to God as a steward of her body, mind, and spirit.

73.     In response to Epic's vaccine mandate, on August 12, 2021, Ms. Zimmerman requested a religious accommodation, explaining that her sincere religious beliefs did not allow her to receive the currently available COVID vaccines because they were all developed or tested using aborted fetal cells and therefore did "not respect [] human dignity."

74.     Epic initially granted Ms. Zimmerman's request for a religious accommodation exempting her from its vaccine mandate, but unbeknownst to Ms. Zimmerman, Epic had no intention of keeping this arrangement and had already begun planning to revoke her accommodation.

75.     On September 28, 2021, Epic sent Ms. Zimmerman an email stating "[a]s we previously discussed, you have been approved for a temporary exemption to Epic's vaccine requirement as an accommodation. This is based on your existing job responsibilities and will be re-evaluated as job responsibilities, the public health situation surrounding COVID-19, or our ability to accommodate your situation changes."

76.     As part of Ms. Zimmerman's approved accommodation, Epic imposed a number of unreasonable requirements unrelated to workplace safety that were designed to ostracize and humiliate:

      a.  Ms. Zimmerman was required to take a demotion and was removed from her management position.

b.  Ms. Zimmerman was required to submit a negative COVID test every Monday, Wednesday, and Friday, even if she was working remotely from home.

c.  Ms. Zimmerman was required to wear a mask indoor at all times, unless she was in her office alone with the door closed.

d.  Ms. Zimmerman was prohibited from entering or even purchasing food from any of the culinary facilities on campus.

e.  Ms. Zimmerman was prohibited from entering any of the kitchen or break room areas on campus more than twice a day and was instructed to "ensure there are no other people in the room at the time of use."

f.  Ms. Zimmerman was prohibited from sharing an elevator with her coworkers.

g.  Ms. Zimmerman was prohibited from attending large in-person meetings and could only attend an in-person meeting if she could "ensure you'll be able to stay 6 feet away from all other attendees."

77.     Epic knew that these accommodations were unreasonable and unrelated to workplace safety. But Epic imposed them intentionally to provide humiliating workplace requirements on Ms. Zimmerman to punish her for her religious beliefs regarding vaccination and to coerce her into violating her beliefs, or leaving the company.

78.     Ms. Zimmerman abided by the unreasonable requirements mandated by Epic. When she did not accept vaccination or quit according to Epic's plan, it brazenly ripped up its promise to accommodate her religious beliefs.

79.     On October 8, 2021, Epic's human resources representative Erin McWilliams informed Ms. Zimmerman that Epic was changing her core job duties to now require "immersion trips" to "support and learn" from Epic's clients, and that as such her approved accommodation would no longer be offered after November 14, 2021.

80.     In the same email, Ms. McWilliams offered Ms. Zimmerman the opportunity to apply for a position as a "2nd shift painter"—a dramatically different and lower paying position— instead of being terminated.

81.     Epic unilaterally changed the terms of Ms. Zimmerman's employment as a pretext to revoke her religious accommodation and terminate her employment.

82.     Epic refused to engage in any interactive process or to even consider available accommodations in good faith. Instead, Epic terminated Ms. Zimmerman's employment on November 14, 2021.

83.     Ms. Zimmerman filed a timely charge of discrimination with the EEOC describing Epic's discrimination and failure to accommodate her religious beliefs.

84.     On March 23, 2023, the EEOC issued a Notice of Right-to-Sue, and Ms. Zimmerman timely brought this action.

## CLASS ALLEGATIONS

85.     Named Plaintiffs seek to represent and certify the following class (the "Class").

86.     The Class consists of all individuals who, between July 30, 2021 and the entry of judgment in the case:

    a.   Were employed by or applied for a position at Epic;

    b.   Requested that Epic accommodate their religious beliefs by exempting them from receiving a COVID vaccine;

    c.   After requesting the exemption, either:

        i.   were fired, suspended, disciplined, or subjected to any adverse employment action by Epic as a result of not receiving a COVID vaccine, or

        ii.   were not hired by Epic to a position for which they applied.

87.     Named Plaintiffs cannot determine the exact number of members in the Class, since doing so would require access to Epic's records of class members' exemption requests. However,

on information and belief, Named Plaintiffs estimate that the class consists of at least many dozens of individuals, rendering it so numerous that joinder of all member is impracticable.

88.     There are significant questions of law and fact common to the class, including:

- Whether Epic adopted a policy, practices, and/or processes intended to purge the company of employees whose religious beliefs prevented COVID vaccination;
- Whether Epic adopted a policy, practices, and/or processes resulting in the rejection of class members requests for religious accommodations exempting them from the company's COVID mandate, without any individualized good-faith consideration of the employee's proposed accommodations, available reasonable accommodations, or the hardship on the company of discharging numerous religious employees;
- Whether the company discriminated against class members on the basis of their religion, in violation of Title VII;
- Whether unvaccinated class members could have engaged in weekly testing and other basic precautions so that they would have been less likely to transmit COVID in the workplace than the vaccinated Epic employees who did not regularly test for COVID; and
- Whether Epic's failure to consider or offer weekly testing or other available reasonable accommodations violated Title VII.

89.     Named Plaintiffs' claims are typical of the claims of the other class members. Like the rest of the class, Named Plaintiffs requested a religious exemption from Epic's COVID vaccine mandate, and Epic denied their requests and fired them without any serious consideration of their proposed accommodations. Named Plaintiffs have no conflicts of interest with the class.

90.     Epic has acted on grounds that apply generally to the class because, as against each class member, it has taken adverse employment actions without engaging in the legally required interactive process or otherwise giving good-faith consideration to the class member's request for a religious accommodation. As a result, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

91.     Questions of law or fact common to class members predominate over any questions affecting only class members. Because Epic uniformly denied requests for religious accommodations without considering the employee's individual proposed accommodations, the

lawfulness of its process can be determined in common for the entire class. In addition, a large portion of the damages due to class members consists of back pay or other lost wages, which can be calculated mechanically based on records maintained by Epic.

92.     A class action is superior to other available methods for fairly and efficiently adjudicating the claims of class members. Epic discriminated against all class members in exactly the same way, and through the application of a uniform policy. Therefore, individual litigation of class members' claims would involve repeated re-litigation of exactly the same questions.

### COUNT I
**Religious Discrimination, Failure to Accommodate Religious Beliefs, Practices, or Observances in Violation of Title VII of the Civil Rights Act of 1964**

93.     Plaintiffs re-allege each of the foregoing paragraphs.

94.     Epic is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

95.     Title VII prohibits discrimination on the basis of religion in hiring or firing employees, *Id*. § 2000e-2, and requires employers to reasonably accommodate their employees' sincerely held religious beliefs. *Id*. § 2000e(j).

96.     Plaintiffs were employees of Epic who held sincere religious beliefs that prevented them from receiving any COVID vaccine.

97.     Plaintiffs informed Epic of the conflict between their religious beliefs and the company's COVID vaccine mandate.

98.     Title VII requires that requests for reasonable accommodation be considered based on an employees' individual, particularized circumstances, and that any claim of undue hardship by the employer be assessed on a case-by-case basis rather than through a rote or blanket application of company policy, including vaccine mandates.

17

99.     Title VII prohibits employers from discriminating against employees based on customer preferences or perceived customer preferences.

100.    When an employee or job applicant requests an accommodation, Title VII requires that employers engage in a good faith interactive process whereby the employer and employee work together, exchanging information, with the goal of identifying an effective and reasonable accommodation.

101.    Epic violated Title VII by discriminating against Ms. Zimmerman, Mr. Greiveldinger, and class members on the basis of religion, including through its policies and practices that discriminated against employees and job applicants who sought religious accommodations exempting them from Epic's COVID vaccine requirement.

102.    Epic violated Title VII by summarily revoking religious exemptions, by failing to interact, by failing to consider accommodations, and by failing to engage in a good-faith efforts to determine if a reasonable accommodation was available that could eliminate the conflict between Epic's COVID vaccine requirement and the religious beliefs, practices, or observances of Ms. Zimmerman, Mr. Greiveldinger, and class members.

103.    Epic also violated Title VII by its failure to reasonably accommodate Ms. Zimmerman's, Mr. Greiveldinger's, and class members' sincerely held religious beliefs, practices, or observances that conflicted with Epic's COVID vaccine requirement, even though such accommodation would not have created an undue hardship under Title VII.

104.    Epic violated Title VII by refusing to retain records related to its religious accommodation decisions regarding Ms Ms. Zimmerman, Mr. Greiveldinger.

105.    Epic violated Title VII by subjectively judging Ms. Zimmerman's, Mr. Greiveldinger's, and class members' religious beliefs.

106.    Epic violated Title VII by requiring Ms. Zimmerman, Mr. Greiveldinger, and class members to follow a process different from other employees with different religious beliefs and by creating a process that was designed to discourage and deny requests for religious accommodation.

107.    Epic violated Title VII and cannot demonstrate any undue hardship because allowing a small fraction of its workforce to arrange travel consistent with their vaccination status would not have caused an undue hardship on the company.

108.    Epic violated Title VII by creating a process for considering religious accommodation requests intended to allow its legal counsel to create false, post hoc justifications to mask anti-religious bias.

109.    Epic violated Title VII by granting sham and unreasonable purported religious accommodations to Ms. Zimmerman and class members that were intended to coerce or humiliate employees, rather than reasonably accommodate these employees' religious beliefs.

110.    The lack of any undue hardship from religious accommodations is demonstrated by (among other things) Epic's previous grant of accommodations to Ms. Zimmerman and to many class members, and by Epic's willingness to allow Ms. Zimmerman and many class members to continue working, unvaccinated, for many months after they were granted exemptions.

111.    Nevertheless, Epic engaged in religious discrimination against Ms. Zimmerman, Mr. Greiveldinger, and class members by revoking religious exemptions, and by designing unlawful policies, practices, and processes that systematically denied future requests for religious accommodations from its COVID vaccine requirement.

112.    Because it refused to consider and refused to provide reasonable religious accommodations, Epic fired and took other adverse employment action against Ms. Zimmerman, Mr. Greiveldinger, and class members.

113.    Had Epic interacted with Ms. Zimmerman, Mr. Greiveldinger, and class members in good faith regarding their requests, it would have quickly realized that reasonable measures were available to accommodate class members' religious beliefs while imposing no burden or a de minimis burden on Epic.

114.    Epic failed to offer any reasonable accommodation to Ms. Zimmerman, Mr. Greiveldinger, and class members and instead it fired them. Epic's actions constitute discrimination on the basis of religion and failure to accommodate, all in violation of 42 U.S.C §§ 2000(e)-2 and 2000(e)(j).

115.    Because of Epic's unlawful actions, Ms. Zimmerman, Mr. Greiveldinger, and class members suffered and continue to suffer economic and other damages in amounts to be proven at trial, including back pay, front pay, emotional distress damages, compensatory damages, punitive damages, and attorneys' fees.

## **JURY DEMAND**

Named Plaintiffs and the Class demand a trial by jury on all claims and issues for which they have a right to trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Named Plaintiffs and the Classes pray for judgment against Epic and that this Court:

A.  Adjudge, decree, and declare that Epic is liable to Named Plaintiffs and Class members for their actual damages in amounts to be proven at trial, including back pay, front pay,

emotional distress and pain and suffering, compensatory damages, punitive damages, interest, and any other damages or penalties available at law or in equity;

B.  Order and enjoin that Epic grant exemptions from COVID vaccination to all Class members, reinstate the employment status of any Class member who requests it (with no diminishment in seniority);

C.  Award Named Plaintiffs and Class members their costs, damages, reasonable attorneys' fees, prejudgment interest, and any other relief permitted by statute or regulation; and

D.  Award such other or further relief as the Court may deem necessary, proper, just or equitable.

Dated:  June 16, 2023                    Respectfully submitted,

**JEFF GREIVELDINGER AND VICTORIA ZIMMERMAN**

By their Counsel:

 s/Samuel W. Diehl (MN#0388371)
Samuel W. Diehl (MN#0388371)
Harry Niska (MN#0388371)
Nathan Hopkins (PA#328162)
CROSSCASTLE PLLC
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
Tel: (612) 429-8100
Fax: (612) 234-4766
Email: sam.diehl@crosscastle.com
          harry.niska@crosscastle.com
          nathan.hopkins@crosscastle.com

4866-3819-1466, v. 7